**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| JOSIAH WALKER<br><br>Plaintiff,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF MICHIGAN; DOMENICO GRASSO in his official capacity; SANTA ONO, in his individual capacity; ROBERT HEWLETT III, in his official capacity as University of Michigan's Executive Vice President and Chief Financial Officer; AMY GRIER, individually and in her official capacity as University of Michigan's Associate Director Staff Human Resources; UNIVERSITY OF MICHIGAN'S EXECUTIVE DIRECTOR OF THE DIVISION OF PUBLIC SAFETY AND SECURITY in their official capacity; EDDIE WASHINGTON in his individual capacity; CRYSTAL JAMES, individually and in her official capacity as University of Michigan's Chief of Police; and University of Michigan police officers RYAN CAVANAUGH, ARON FELTES, DARIAN GREELEY, KEVIN HARDING, JEREMIAH ROBERTS, MARK WEST, and JACOB YENCER, individually and in their official capacities; JOHN DOE OFFICERS 1 and 2, individually; and AMERISHIELD PROTECTION GROUP D/B/A CITY SHIELD SECURITY SERVICES; JAMES KINCANNON, KENNETH CRAIG, DOUG BAYER, and LEE VICTORIAN,<br><br>Defendants. | Case No. 2:26-cv-11674-LJM-KGA<br><br>Hon. Laurie J. Michelson<br>Mag. Kimberly G. Altman |

Amy V. Doukoure (P80461)
Jad Salamey (P88517)
CAIR-MI LEGAL FUND
1905 S. Haggerty Road, Suite 5
Canton, MI 48188
(248) 559-2247
adoukoure@cair.com
jsalamey@cair.com
***Attorneys for Plaintiff***

Hasan Kaakarli (P81099)
Emad R. Hamadeh (P86849)
AKEEL & VALENTINE, PLC
888 W. Big Beaver Rd., Ste. 350
Troy, MI 48084
(248) 269-9595
hasan@akeelvalentine.com
emad@akeelvalentine.com
***Attorneys for Plaintiff***

John C. Philo (P52721)
Liz Jacob (P86981)
SUGAR LAW CENTER FOR
ECONOMIC & SOCIAL JUSTICE
4605 Cass Ave., 2nd Floor
Detroit, MI 48201
(313) 993-4505/Fax: (313) 887-8470
jphilo@sugarlaw.org
ljacob@sugarlaw.org
***Attorneys for Plaintiff***

_______________________________________________/

**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

NOW COMES, Plaintiff, JOSIAH WALKER, by and through his counsel and in support of his First Amended Complaint against Defendants does hereby allege as follows:

## I. NATURE OF PLAINTIFF'S CLAIMS

1. This is a civil rights action brought under the United States Constitution, 42 U.S. Code § 1983 and Michigan law.

2. Plaintiff JOSIAH WALKER seeks redress for a sustained campaign of retaliation, surveillance, harassment, and unconstitutional punishment carried out

by Defendants in response to Plaintiff's protected speech and activism on the University of Michigan campus.

3. Plaintiff WALKER is a Black, Muslim, politically engaged student who advocated on the University of Michigan's Ann Arbor campus in support of Palestinian human rights from 2023-2024.

4. Plaintiff WALKER'S advocacy included calls for divestment, condemnation of genocide, and promotion of nonviolent resistance which placed him at the center of student-led pro-Palestinian organizing at the University of Michigan.

5. Defendants acted against Plaintiff WALKER because of the content of his speech and the viewpoints he expressed, as well as his racial and religious identities. As a result, Defendants subjected Mr. Walker to a deliberate and unlawful pattern of harassment and retaliation.

6. In response to Plaintiff WALKER's lawful speech, Defendants carried out a series of punitive conduct designed to intimidate and retaliate against him because of his speech, viewpoints, and associations. Defendants' conduct included:

- The commissioning of prolonged, harassing, and intrusive surveillance by a private security contractor;
- The detainment of Plaintiff, without reasonable suspicion of him having committed a crime;
- The arrest of Plaintiff, without probable cause;

- The false imprisonment of Plaintiff;
- The physical assault and use of excessive force against Plaintiff on multiple occasions;
- The seizure of Plaintiff's personal property and religious items without due process or probable cause;
- The issuance and implementation of retaliatory trespass bans without due process;
- The initiation and implementation of retaliatory adverse employment actions without due process; and
- The deliberate fabrication and coordination of exaggerated, misleading, and hyperbolic police reports to manufacture a false narrative of criminality, which were then used to support search warrants targeting Plaintiff's private electronic communications, data stored on the device, as well as data stored on cloud based servers.

7. The campaign against Mr. WALKER disrupted his education; barred him from employment at the University; placed him in financial peril as a student working to afford his education; damaged his reputation; invaded his privacy; caused physical injury; inflicted emotional distress; deprived him of his property; and caused other harm and damages.

8. This lawsuit seeks to vindicate Plaintiff WALKER's constitutional rights, hold Defendants accountable for this unlawful campaign of retaliation, and ensure that Michigan's flagship public university remains a place where diverse viewpoints are protected and not punished.

## II. JURISDICITON AND VENUE

9. Because this civil rights action arises under the United States Constitution, this Court has jurisdiction under Article III of the U.S. Constitution and under 28 U.S.C. §§ 1331; 1343(a)(3)-(4); and 1367.

10. Venue is proper pursuant to 28 U.S.C. § 1391(e) because the incidents, events, and occurrences giving rise to this action occurred in the Eastern District of Michigan and because all Parties are domiciled in the Eastern District of Michigan.

11. This Court is authorized to award the requested declaratory and injunctive relief under 42 U.S.C. § 1983, 28 U.S.C. §§ 2201-2202, and the Court's equitable powers.

## III. PARTIES

12. Plaintiff JOSIAH WALKER is a resident of the State of Michigan and, at all relevant times, was enrolled as a student or under a leave of absence as a student at the University of Michigan (hereafter "University" or "UM"). Mr. Walker is a Black Muslim student. Mr. Walker participated in campus advocacy in support of Palestinian human rights at the University of Michigan. Mr. Walker was at relevant times a board member of the student organization Students Allied for Freedom and Equality ("SAFE") and lead volunteer with the campus Muslim chaplaincy. While a student at the University, Mr. Walker served as president of the University's official, nonpartisan civic engagement organization; vice president of

the largest of the University's schools and colleges; and co-founder of a student group that advocated for improvements to the university's sexual misconduct policy. Mr. Walker was also at relevant times a student employee or otherwise had an employment relationship with the University of Michigan.

13. Defendant REGENTS OF THE UNIVERSITY OF MICHIGAN ("REGENTS") is a body corporate with its principal place of business in the City of Ann Arbor, County of Washtenaw, State of Michigan. Defendant REGENTS have general supervisory powers over the University of Michigan and its officers and control and direct all the institution's expenditures. The REGENTS have the power to set, amend, and enforce University policy and to ensure that the University's policies are observed by all University officials and employees. The REGENTS have final authority to approve or disapprove of personnel hired by the University.

14. Defendant DOMENICO GRASSO ("GRASSO") is currently employed by the University of Michigan, Ann Arbor as the University's President. Mr. Grasso serves as "the principal executive officer" of the University of Michigan, Mich. Const. art. VIII § 6, responsible for "general oversight of … the business and financial welfare of the University; and the maintenance of health, diligence, and order among the students" along with directing inferior executive officers. Mr. Grasso is sued in his official capacity.

15. Defendant SANTA ONO ("ONO") was previously employed by the University of Michigan, Ann Arbor as the University's President at times relevant to this suit. Mr. Ono's duties and functions included general oversight powers inherent as chief executive of the University, including but not limited to oversight of all University vice presidents, oversight and hiring and firing of all staff and contractors, and maintaining order and the welfare of students. Mr. Ono had the power to set, amend, and enforce university policy and to ensure that the university's policies are observed by all university officials and other employees. Mr. Ono is sued in his individual capacity.[1]

16. Defendant ROBERT HEWLETT III ("HEWLETT") is the Executive Vice President, and Chief Financial Officer at the University of Michigan. Mr. Hewlett oversees human resources and related services. Mr. Hewlett's duties and functions include decision-making and oversight powers relating to University human resources and employment matters, including employee grievances. Further, Mr. Hewlett has been delegated the "general authority and supervision" over the use of facilities on campus. Mr. Hewlett "establishes the overarching facilities policy framework" for the University of Michigan. Additionally, he has the power to set, amend, and enforce university policy as it relates to human resources and

[1] As a former President of the University of Michigan, he is sued in his official capacity as well through the preceding paragraph.

University employment, and to ensure that the university's policies are observed by all subordinate employees and human resources staff. Mr. Hewlett also oversees the University's Investment Office, which is responsible for managing and investing the University's endowment and other financial resources. Mr. Hewlett is sued in his official capacity.

17. Defendant AMY GRIER ("GRIER") is and was, at all times relevant, employed as an Associate Director in the Human Resources Department at the University of Michigan. Ms. Grier issued adverse employment actions to Plaintiff WALKER. Ms. Grier is sued in her individual and official capacities.

18. Defendant EXECUTIVE DIRECTOR OF THE UNIVERSITY OF MICHIGAN DIVISION OF PUBLIC SAFETY AND SECURITY ("EXECUTIVE DIRECTOR DPSS") manages the various units of the Division of Public Safety and Security ("DPSS"), which includes the University of Michigan Police Department ("UMPD"), whose officers were responsible for significant adverse actions against Plaintiff WALKER at issue in this lawsuit. The Executive Director DPSS determines private security contractors, including Defendant CITY SHIELD, that contract with DPSS and UMPD and retains, manages, and oversees such contractors. The Office of the Executive Director DPSS is named as a Defendant and is sued in its official capacity.

19. Defendant EDDIE WASHINGTON ("WASHINGTON") was, at relevant times, employed by the University of Michigan as the Executive Director of University of Michigan Division of Public Safety and Security. In that capacity, he managed the various units of the DPSS, which included the University of Michigan Police Department, whose officers issued each trespass ban at issue in this lawsuit. Mr. Washington retained, oversaw, and directed Defendant CITY SHIELD's contract with DPSS and/or UMPD. Mr. Washington is sued in his individual capacity.

20. Defendant CRYSTAL JAMES ("JAMES") is the Chief of the University of Michigan Police Department, which is an agency housed within the University of Michigan Division of Public Safety and Security. Defendant JAMES is responsible for managing and supervising the University of Michigan Police Department and its employed officers. She is also the presiding decision-maker at the first stage of appeal of trespass bans issued by the University of Michigan Police Department, whose officers issued each trespass ban at issue in this lawsuit. Ms. James also oversees, directs, and manages Defendant CITY SHIELD and its agents coordination with DPSS and/or UMPD. Ms. James is sued in her individual and official capacities.

21. Defendant RYAN CAVANAUGH ("CAVANAUGH") was at all relevant times a law enforcement officer employed by DPSS and/or UMPD. Mr. Cavanaugh is sued in both his individual and official capacities.

22. Defendant ARON FELTES ("FELTES") was at all relevant times a law enforcement officer employed by DPSS and/or UMPD. Mr. Feltes is sued in both his individual and official capacities.

23. Defendant DARIAN GREELEY ("GREELEY") was at all relevant times a law enforcement officer employed by DPSS and/or UMPD. Mr. Greeley is sued in both his individual and official capacities.

24. Defendant KEVIN HARDING ("HARDING") was at all relevant times a law enforcement officer employed by DPSS and/or UMPD. Mr. Harding is sued in both his individual and official capacities.

25. Defendant JEREMIAH ROBERTS ("ROBERTS") was at all relevant times a law enforcement officer employed by DPSS and/or UMPD. Mr. Roberts is sued in both his individual and official capacities.

26. Defendant MARK WEST ("WEST") was at all relevant times a law enforcement officer employed by DPSS and/or UMPD. Mr. West is sued in both his individual and official capacities.

27. Defendant JACOB YENCER ("YENCER") was at all relevant times a law enforcement officer employed by UMPD. Mr. Yencer is sued in both individual and official capacities.

28. Defendants JOHN DOE OFFICERS 1 and 2 are law enforcement officers employed by UMPD who took part in the May 21, 2024 raid on the Diag Encampment (described further below). They are the two officers who shoved Plaintiff WALKER to the ground from behind, as described below. Plaintiff WALKER does not yet know their names. They are sued in their individual capacities.

29. Defendant AMERISHIELD PROTECTION GROUP D/B/A CITY SHIELD SECURITY SERVICES (hereafter "CITY SHIELD") is a private security company incorporated under the laws of Michigan. CITY SHIELD was contracted by the University to monitor, surveil, and report on student protest activities and student protestors' private activities, including those of Plaintiff WALKER. At all relevant times, CITY SHIELD and its employees, and agents acted under color of state law. As such, the actions of CITY SHIELD are fairly attributable to the University and other Defendants. At all relevant times, CITY SHIELD and its employees, and agents were engaged in a public function; undertook joint action with the University; its activities were inextricably entwined with the University;

and/or there was such a close nexus between the University and CITY SHIELD's conduct such that it should fairly be considered the actions of the state itself.

30. Defendant JAMES KINCANNON ("KINCANNON") was at all relevant times an employee and agent of Defendant CITY SHIELD.

31. Defendant KENNETH CRAIG ("CRAIG") was at all relevant times an employee and agent of Defendant CITY SHIELD.

32. Defendant DOUG BAYER ("BAYER") was at all relevant times an employee and agent of Defendant CITY SHIELD.

33. Defendant LEE VICTORIAN ("VICTORIAN") was at all relevant times an employee and agent of Defendant CITY SHIELD.

## IV. COMMON ALLEGATIONS OF FACT

### The University of Michigan is a Public University that Expressly Condones, Encourages, Celebrates and Prides Itself on Traditions of Free Speech and Student Protest

34. The University of Michigan ("UM" or the "University") is a public university with campuses in Ann Arbor, Dearborn, and Flint, Michigan.

35. For decades, the University has publicly claimed to be a bastion of free speech, protest, and student activism. On official platforms and in administrative communications, the University affirms that "freedom of speech is essential to our

mission" and that student voices, especially those expressed through protest, are "critical to democratic engagement on campus."[2]

36. For decades, members of the UM Community have raised their voices and advocated on campus at demonstrations, rallies, teach-ins, marches, strikes, sit-ins, pickets, and educational events for many important social and political issues. These issues include, but are not limited to, the Vietnam War, the Civil Rights Movement, climate change, racial justice, reproductive justice, workers' rights, and Israel-Palestine.

37. In line with this declared posture, the University has allowed — and even celebrated — various forms of student protest and dissent. From climate justice rallies and LGBTQ+ advocacy marches to demonstrations supporting Ukraine and commemorating victims of school shootings, student groups have occupied central campus spaces, including the Diag, sidewalks, and other public areas, for prolonged periods without retaliation or pre-emptive censorship.

38. Divestment campaigns are one example of a successful and important form of student advocacy at the University of Michigan.

39. After years of protest, the University's Board of Regents passed its first resolution to divest from apartheid South Africa in the late 1970s.

[2] *See Generally*, https://publicaffairs.vpcomm.umich.edu/key-issues/free-speech-on-campus

40. In 2000, the University of Michigan divested from tobacco companies. In 2002, the University began the process of divesting from fossil fuels. In 2022, the University divested from Russia.

41. Each of these actions by the Board of Regents followed advocacy, demonstrations, and other protest activity by University students, faculty, staff and/or community members.

42. Today, the University of Michigan commemorates the campus's long history of sit-ins, protests, demonstrations, marches, teach-ins, and divestment movements in its classrooms, academic buildings, alumni magazines, websites, symposiums, and events.

43. University administrators express their admiration for the University's long history of student activism — in brochures directed to prospective students, on murals on campus buildings, in classroom instruction, in social media posts, and through school-wide emails to the University community.

44. Dating back to the Civil Rights Movement and Vietnam War era, the University is believed to have maintained a consistent policy of not retaliating against students, employees, and community members for non-violent expressions of speech, protest, and demonstration.

**After October 2023, Protests on the University's Campus Remained Consistent, Yet the University's Response Dramatically Changed.**

45. Groups advocating both in support of Palestinian rights and in support of Israel have long existed on the University of Michigan's campus.

46. For decades, there has been a movement of students and community members advocating for the human rights of Palestinians and calling for the University to divest from Israel and companies complicit in furthering human rights violations against Palestinians.

47. Members of the University community regularly participate in demonstrations, sit-ins, protests, marches, strikes, and other methods of advocacy to speak out for the human rights of Palestinians and for the University to divest from Israel and from companies complicit in violating the human rights of Palestinians.

48. The methods of advocacy used by the divestment movement at the University of Michigan – including peaceful demonstrations, sit-ins, encampments, and educational programming – have remained consistent over time.

49. Since October 7, 2023, student activities on campus – both in support of and in opposition to Israel's actions in Gaza – have dramatically increased.

50. These activities have included marches, vigils, sit-ins, and other educational events and expressive activities by students.

51. Since October 7, 2023, Plaintiff WALKER regularly attended protests, demonstrations, sit-ins, marches, cultural events, and other expressive activities in

support of Palestinian human rights and advocating for the University to divest from companies and institutions complicit in Israel's ongoing genocide.

52. Since October 7, 2023, the University's response to pro-Palestine and pro-divestment speech and protest activities by students and other community members has changed dramatically.

53. Since October 7, 2023, the University has solely targeted, discriminated against, and punished students and protesters for engaging in speech and protest activity in support of Palestine and calling for the University to divest from Israel as a means of pressuring Israel to cease human rights violations against the Palestinian people, including crimes against humanity and genocide.

54. Defendants have targeted students, including Plaintiff WALKER, and in so doing, sought to make an example of him to deter others from expressing viewpoints that Defendants view as pro-Palestinian and to deter others from engaging in similar speech and expressive activities.

55. In so doing, Defendants have taken a range of punitive measures, including taking the unprecedented move to retain outside consultants to bring student discipline complaints on behalf of the University itself; initiating disciplinary proceedings against individuals; initiating disciplinary proceedings against student organizations; summarily issuing trespass punishments to ban protesters from campus; terminating workers' employment; criminalizing protest activity; and

barring students and alumni from any future employment across the entire University system.

56. During the previous half century, no such measures are known to have been taken at any time by the University against protesters who had engaged in speech and related activities on other important issues of public concern.

57. Recent events have revealed a double standard in the University's enforcement of speech policies. While students promoting widely accepted or institutionally aligned messages have faced no punitive action, students, particularly students of color and Muslim students, advocating for Palestinian human rights and criticizing Israeli state actions have been subjected to heightened scrutiny, retaliation, disciplinary threats, criminalization, and surveillance.

58. Defendants targeted Plaintiff WALKER because he was a visible student protester and they desired to chill on-campus speech and protest, silence viewpoints advocating for the human rights of Palestinians, and retaliate against advocacy calling for divestment from Israel and from companies complicit in violating the human rights of Palestinians.

59. The selective enforcement of speech-related policies and the discriminatory application of punitive sanctions underscore the University's departure from its own stated commitments. Rather than protect dissent, the University has mobilized law enforcement and third-party surveillance firms against

students, like Plaintiff WALKER, whose viewpoints diverge from institutional or political preferences.

60. University officials, including the Defendants, have not taken such measures against similarly situated persons, including others espousing opposing viewpoints, such as support of Israeli policies in Gaza.

**Plaintiff WALKER is Attacked by Police at UMPD Raid on Peaceful Palestine Solidarity Encampment**

61. One key on-campus demonstration in support of Palestinian human rights was a month-long encampment on the Diag from April 22, 2024, until May 21, 2024 (the "Diag Encampment").

62. Plaintiff WALKER participated in the Diag Encampment, a peaceful protest established on April 22, 2024, to demand the University divest from companies profiting from the humanitarian crisis in Gaza. Students from diverse backgrounds including of Muslim, Christian, Jewish, and other identities, maintained the encampment using community-based, nonviolent principles.

63. In the early morning hours of May 21, 2024, however, UMPD officers, as well as officers from other jurisdictions, raided the encampment to dismantle it and disperse participants.

64. Officers utilized riot gear, batons, and chemical agents against participants present at the encampment during the raid.

65. UMPD's own reports state that the first dispersal announcement that was read and gave demonstrators ten minutes to leave. The same reports state that the police line was ordered to move forward before the ten minutes had run.

66. During this raid, Defendant HARDING deployed a strong chemical agent before any verbal dispersal order had expired and before peaceful demonstrators including Plaintiff WALKER had any opportunity to comply.

67. Defendant HARDING intentionally adjusted his arm and spray pattern to spray Plaintiff WALKER directly in the face.

68. The chemical agent was AERKO "Deep Freeze," a spray that combines pepper spray (OC) and tear gas (CS). Defendant HARDING reported that he served as the "primary grenadier" during the raid. He reported that he sprayed individuals from approximately four to six feet away in bursts of one to three seconds. Defendant HARDING gave Plaintiff WALKER no warning before spraying him in the face.

69. Plaintiff WALKER was completely blinded, in excruciating pain, suffering breathing difficulties after inhaling these chemical agents, disoriented, and desperately seeking medical assistance when he was shoved to the ground from behind by two officers, Defendants JOHN DOE OFFICERS 1 and 2, so hard that his body bounced up off the ground.

70. At no point did Plaintiff WALKER pose a threat, resist, or engage in any conduct that justified the use of force. In fact, he was attempting to comply with police orders when he was sprayed with a chemical agent and then was thrown to the ground as he continued to attempt to depart as requested.

71. Plaintiff WALKER was not issued a trespass warning, detained, or arrested at the Encampment.

72. As a result of the chemical agent and the shove, Plaintiff WALKER suffered sustained physical pain and emotional distress, including burning, coughing, hyperventilating, strong nasal discharge and profuse tearing, panic, disorientation, and complete destruction of prescription lenses among other things.

**After the Encampment, Plaintiff WALKER Attempted to Retrieve Personal and Religious Property from UMPD and Defendants Retaliated Against Him.**

73. During and after the encampment raid, UMPD officers seized property belonging to Muslim and pro-Palestinian students and student organizations, including prayer mats, Qurans, personal electronics, Palestinian flags, and cultural items.

74. The seized property included Plaintiff WALKER's own belongings, including a sleeping bag and blankets.

75. No warrant authorized the seizure of Plaintiff WALKER's property. No exception to the warrant requirement applied. The property was not abandoned. It was not contraband. It was not evidence of a crime. It was not at risk of being

destroyed. The seizure was not a random or unauthorized act. It was part of a planned operation that DPSS leadership directed and supervised. UMPD's own reports state that "[a] detailed plan was developed to remove the encampment on May 13, 2024," and that the plan "included over 100 public safety personnel from 4 different agencies."

76. They state that the plan was postponed and that the May 21, 2024 removal was based in part on "ongoing leadership discussions." Those reports state that officers placed "[a]ll religious items, prayer rugs, Korans [sic], and flags" in a container. They also state that "[i]tems of value were sorted and placed in a container to be logged."

77. Defendants did not notify Plaintiff WALKER that they had taken his property. He learned of the seizure only after a University staff member called UMPD to ask. Defendants gave him no hearing or other opportunity to contest the seizure.

78. The UMPD assured University staff and students, including Plaintiff WALKER, that no one would face consequences while retrieving their property. These assurances were made multiple times to UM staff and directly to Mr. Walker.

79. Personnel from UMPD assured Plaintiff WALKER, despite his not asking, that no one would face consequences for retrieving items taken by the UMPD.

80. On or around May 23, 2024, Plaintiff WALKER then went to the UMPD station to recover seized items belonging to student organizations, peers, and himself including Qurans, prayer mats, Palestinian flags, personal electronics, and cultural belongings.

81. While Plaintiff WALKER waited at the UMPD's station for his property to be retrieved and returned, Defendant CAVANAUGH abruptly stormed into the lobby, called out Mr. Walker's name, and summarily issued him a verbal and then written trespass warning on the spot.

82. At the time, DPSS maintained a policy purportedly authorizing UMPD officers to enforce the State of Michigan's trespass statute, M.C.L. § 750.552, on behalf of the University.

83. The policy authorizes officers to issue a document which it euphemistically describes as a "warning" (hereinafter a "trespass ban"), but which prohibits individuals from entering or remaining on huge swaths of University property for one year under threat that violating the ban and returning to campus would subject an individual trespassed to arrest and criminal prosecution for trespassing.

84. The Trespass Policy in place at the time that Plaintiff WALKER was trespassed authorized UMPD officers to unilaterally and at their complete discretion issue a trespass ban on their own accord for any one (or more) of four reasons

because an individual: (1) committed or is suspected of committing a crime" on campus; (2) refused or failed to comply with established University rules; (3) disrupted lawful operations and functions of the University; or (4) demonstrated a risk of physical harm or injury to others or property.

85. The UMPD Officer is not required to explain the basis for the ban to the recipient or anyone else.

86. A UMPD officer does not need to seek advance permission from anyone before issuing a trespass ban.

87. The Trespass Policy in place at the time that Plaintiff WALKER was trespassed by Defendant CAVANAUGH states that a trespass ban may only be issued to faculty, students, and staff "in extenuating circumstances (e.g., posing an *immediate* threat to the safety of others)," and that UMPD officers have multiple alternatives to issuing him a trespass ban.

88. All trespass bans last for one year from issuance.

89. Defendant CAVANAUGH held a pre-prepared trespass ban form in his hand, which he completed and signed himself.

90. The trespass ban form banned Plaintiff WALKER from the "Diag". That single word was the only description of the banned area on the form. The form contained no map and stated no boundaries.

91. The trespass ban form that Defendant CAVANAUGH handed to Plaintiff WALKER had boxes checked that the ban was issued because Mr. Walker: (1) committed or was suspected of committing a crime while on campus or against persons or property; (2) disrupted the operation and lawful function of the university; and (3) demonstrated a risk of physical harm or injury to others or damage to property.

92. Defendant CAVANAUGH did not explain to Plaintiff WALKER what the basis was for the ban that he received.

93. Plaintiff WALKER was not provided with any information as to what crime he was alleged or suspected to have committed.

94. Plaintiff WALKER was not provided with any explanation as to what operations and lawful functions of the University he disrupted.

95. Plaintiff WALKER was not provided with any information as to how he in any way demonstrated a risk of physical harm or injury to others or damage to property.

96. When Plaintiff WALKER requested a map or University definition that provided a clear explanation of what area constituted the Diag, Defendant CAVANAUGH refused.

97. Defendant CAVANAUGH then left the room for an extended period and returned with a separate piece of paper that had a definition of the Diag created

by Mr. Cavanaugh. Mr. Cavanaugh's definition differed from publicly available definitions and maps of the Diag published by the University. Mr. Cavanaugh's description did not clearly identify the boundaries of the Diag.

98. The University's Center for Campus Involvement publicly defines the Diag as "the brick space including the 'M' and the concrete benches at the foot of the steps of Hatcher Graduate Library." The same publication states that "[a]ll sidewalks, grassy areas, plazas, etc. in the surrounding area are coordinated by a different office."

99. Defendant CAVANAUGH's paper stated instead that the Diag is "located between State Street, East Hall and the Dana Building, South University Street and North University Street." That description covers a far larger area than the University's published definition. It takes in the buildings, sidewalks, lawns, and plazas that surround the brick space.

100. The trespass warning was a ban on Plaintiff WALKER's entering into the central public gathering place of the campus community – the Diag – which for generations and presently has served as a hub of expressive demonstration, civic engagement, and social activity.

101. The trespass ban issued by Defendant CAVANAUGH also barred Plaintiff WALKER from fulfilling his job responsibilities at the on-campus Institute for Social Research, whose operations were located in campus buildings within the

area Defendant CAVANAUGH defined as the "Diag" for purposes of the trespass ban.

102. At the time, Plaintiff WALKER served as a Program Specialist with the Inter-University Consortium for Political and Social Research at the Institute for Social Research. The position required him to complete job responsibilities in person.

103. Defendant CAVANAUGH did not provide Plaintiff WALKER with a copy of the trespass warning report or incident report, which made it impossible for Mr. Walker to understand the basis of his trespass ban.

104. Plaintiff WALKER made multiple requests to UMPD for his trespass warning report.

105. For weeks, UMPD refused Plaintiff WALKER's repeated requests for his trespass warning report, claiming it could not be released.

106. Only after Plaintiff WALKER submitted multiple FOIA requests over several months did UMPD eventually generate and provide a trespass warning report. UMPD policy does not require the issuing officer to contemporaneously document the factual basis for the trespass ban. Instead, the report and purported justification are retroactively prepared by Records Department personnel who neither witnessed nor participated in the incident, relying on secondhand information rather than firsthand observations or findings by the issuing officer or supervisor to

justify a trespass ban already imposed. The trespass warning report contained information that did not and could not have existed at the time that Plaintiff WALKER was banned, including facts and allegations that had not yet occurred at the time the trespass ban was issued. Furthermore, the report was devoid of information that should have been included pursuant to applicable UMPD policy.

107. Further, Plaintiff WALKER had no opportunity to challenge the issuance of the trespass ban prior to being deprived of his ability to enter, walk on, protest in, or relax on the Diag.

108. Recipients can only challenge a trespass ban after it is in effect.

109. Within seven days of being issued a trespass ban, the recipient may "object" to it and request a formal hearing.

110. Although a formal hearing is requested, the University may or may not respond to the recipient's request.

111. If it occurs, the so-called formal hearing is presided over by the director of the department that issued the trespass ban.

112. In the case of trespass bans issued by the UMPD, the department director is the Chief of Police, Defendant CRYSTAL JAMES.

113. The hearing is summary in nature and carried out without published rules or procedures.

114. Neither the University nor the issuing officer is required to (and does not) provide the recipient with the evidence against them, nor are they even required to explain what evidence may exist or the particulars of why the ban was issued.

115. The recipient has no right to question anyone about the basis for the ban.

116. If told at all, recipients are often accused in vague or unsubstantiated ways of having committed a crime or told that they are under investigation for having committed an unspecified offense.

117. The only "defense" permitted is that the recipient of the trespass ban is merely asked to explain why their trespass ban should be adjusted—again, typically without being fully aware of the specific basis of the ban or what evidence supports the ban in the first place.

118. Such a lopsided hearing appears to be designed to encourage the recipient to incriminate themselves— by apologizing, promising not to violate the campus rules in future, or otherwise defending themselves simply to get the ban lifted (and without regard to whether any wrongful conduct actually occurred).

119. These statements may then be used by the adjudicating agency (i.e., UMPD) or the University against the individual in contemporaneous or future criminal investigations and prosecutions or in other campus disciplinary actions.

120. Defendant JAMES is required to notify the trespass ban recipient of the results of the formal hearing within fourteen days.

121. If upheld, the recipient has the opportunity for a further appeal to DPSS Executive Director, which was at the time Defendant WASHINGTON, but only if the recipient can demonstrate a change in circumstances.

122. If accepted by the DPSS Executive Director, an appeal triggers an in-person hearing.

123. Here, too, the hearing is entirely one-sided: the appellant is expected to explain why their trespass ban should be modified or rescinded.

124. The DPSS Executive Director, like the Chief of Police before him, does not explain why the appellant was issued the trespass ban or provides any evidence supporting the ban.

125. The DPSS Executive Director's decision is final and unappealable.

126. Plaintiff WALKER submitted an email to DPSS to request a Formal Hearing before Defendant JAMES for his trespass ban on May 26, 2024.

127. On May 29, 2024, Plaintiff WALKER emailed DPSS to request an update on the status of his trespass appeal. UMPD did not respond.

128. On May 30, 2024, Plaintiff WALKER emailed DPSS to request an update on the status of his trespass appeal. UMPD did not respond.

129. On June 3, 2024, Plaintiff WALKER emailed DPSS to request an update on the status of his trespass appeal.

130. On June 4, 2024, a DPSS staff member contacted Plaintiff WALKER to begin scheduling a Formal Hearing regarding Mr. WALKER's trespass ban. Mr. WALKER asked the staff member for all reports and evidence related to his trespass ban and questions that would be utilized during the Formal Hearing. DPSS refused to provide this information. A Formal Hearing date and time were not finalized.

131. On July 15, 2024, Plaintiff WALKER then emailed Chief James directly to request a Formal Hearing for his trespass ban. UMPD Chief James did not respond.

132. On July 24, Plaintiff WALKER sent a follow-up email to UMPD Chief James directly. UMPD Chief James did not respond.

133. Plaintiff WALKER was never provided with the specifics of the basis of the ban, with evidence or information to support the accusations, about what questions would be asked in the hearing, and in a previous email, he had already submitted his objections in writing. As a result, Mr. Walker believed it was futile to participate any further in an appeal and did not take further action to appeal.

**After the Encampment Raid, Defendants Launch Coordinated Campaign to Follow, Stalk, and Surveil Plaintiff WALKER**

134. Just days after the Encampment Raid, Plaintiff WALKER attended Jummah prayers, a weekly Friday Islamic congregational prayer.

135. While Plaintiff WALKER was engaged in fellowship following the conclusion of an on-campus prayer service, an unknown individual, later determined to be an agent of Defendant CITY SHIELD, was observed watching and taking photos of Plaintiff WALKER.

136. This behavior continued for months as unknown individuals, later determined to be agents of Defendant CITY SHIELD, repeatedly surveilled Plaintiff WALKER during congregational prayer times, including surveilling him in the parking lot outside of places of worship he regularly attended, taking photographs of worshippers, and following him as he walked to and from prayer service.

137. Also, around June 2024 and continuing for months, Plaintiff WALKER noticed several unmarked vehicles, later determined to belong to Defendant CITY SHIELD, following him as he travelled from his home to his workplace, to the University campus and to other destinations in Ann Arbor.

138. On multiple occasions, Plaintiff WALKER was monitored by agents from parked vehicles, often white Jeep Compass Latitude vehicles, which were strategically stationed at building exits and walkways along Plaintiff WALKER's known and anticipated travel routes.

139. Around June 2024 and continuing for months, Plaintiff WALKER noticed several of Defendant CITY SHIELD's agents following, watching, documenting, and recording him as he studied, prayed, worked, spent time on campus, gathered with friends, ran errands, engaged in activities off-campus, and participated in campus life activities on the University's campus.

140. University Defendants, including but not limited to Defendants REGENTS, PRESIDENT, ONO, HEWLETT, EXECUTIVE DIRECTOR DPSS, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, and YENCER retained, contracted, collaborated, and coordinated with Defendants CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN, and other CITY SHIELD employees and agents to harass, embarrass, attack, intimidate, surveil, stalk, follow, and track Plaintiff WALKER.

141. Defendant CITY SHIELD's agents, including but not limited to Defendants KINCANNON, CRAIG, BAYER, and VICTORIAN (together "Agents of City Shield" or "City Shield Agents"), engaged in targeted, purposefully harassing, and relentless surveillance of Plaintiff WALKER.

142. Defendant CITY SHIELD's operatives routinely coordinated with UMPD Officers, including but not limited to, Defendants WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, and YENCER, in real time to track Mr. WALKER's movements across campus.

143. On or around August 2024, Plaintiff WALKER saw DPSS parking tags that said "Police Department University of Michigan" prominently on the tag hanging behind the rear-view mirrors of City Shield vehicles and thereafter routinely prominently displayed on various City Shield vehicles.

144. Employees and agents of Defendant CITY SHIELD used group messages and informal communications with officers of UMPD, including but not limited to, Defendants EXECUTIVE DIRECTOR DPSS, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, and YENCER, to relay Plaintiff WALKER's precise locations, activities, and associations to enable UMPD to stage targeted appearances, further surveil his activities, and orchestrate police interactions intended to intimidate and threaten Mr. Walker under the guise of routine patrol.

145. A report received by Defendant REGENTS on October 17, 2024 lists eight purchase orders to Amerishield Protection Group for DPSS between June 16, 2024 and September 15, 2024. None was competitively bid. Together they total more than $850,000 for the services of Defendant CITY SHIELD. These reports are only required to list purchases of $50,000.00 or more.

146. None of the employees or agents of Defendant CITY SHIELD involved in the surveillance of Plaintiff WALKER were individually licensed private

investigators as required under Michigan law for individuals engaged in investigative, surveillance, or intelligence-gathering activities.

147. During the same period, agents of Defendant CITY SHIELD also surveilled, recorded, and tracked Plaintiff WALKER's participation in protests, demonstrations, and other expressive activities.

148. For instance, Defendants BAYER and CRAIG stalked, surveilled, and recorded Plaintiff WALKER observing a demonstration to raise awareness about a human rights crisis in Bangladesh.

149. On multiple occasions, agents of Defendant CITY SHIELD surveilled and recorded videos of Mr. Walker inside campus buildings that were not open to the public, including spaces that required University-issued access cards to enter. Much of this surveillance occurred late at night, during hours when only authorized students, staff, and faculty could lawfully enter. The interiors of these buildings were access-controlled and restricted to University affiliates. Plaintiff WALKER's activities inside them could not be seen from any public place.

150. Individuals affiliated with Defendant CITY SHIELD who participated in surveilling Plaintiff Walker did not possess University employment status or credentials authorizing access to the referenced buildings.

151. The circumstances of their presence in secured areas suggest that access may have been obtained through means not generally available to the public,

including, but not limited to, entry facilitated by University personnel through abnormal or untraditional means, or by following authorized individuals into restricted spaces.

152. The Defendants CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN, and other CITY SHIELD employees and agents inside these restricted buildings and recording Plaintiff WALKER from hallways, elevator landings, and enclosed study areas constituted a serious intrusion into Mr. Walker's privacy, created a climate of intimidation, and bore no relation to any legitimate safety or law-enforcement purpose.

153. For instance, on one occasion on or about July 23, 2024, Defendant CRAIG entered the UM Student Union and maintained prolonged visual surveillance of Plaintiff WALKER, and then later in the night, another agent of Defendant CITY SHIELD approached Mr. Walker in the same building and interrogated him about campus security cameras.

154. The security-camera conversation was a pretextual and coordinated ruse as the same agent of Defendant CITY SHIELD utilized a similar tactic on a second, separate occasion under distinct circumstances.

155. During that July 2024 surveillance instance, Defendant CRAIG passed the enclosed fourth-floor study space where Plaintiff WALKER sat six times between approximately 8:29 p.m. and 10:11 p.m. He repeatedly recorded Plaintiff

WALKER with his phone. When Plaintiff WALKER asked why he kept coming back, Defendant CRAIG answered, “I just like to see you.”

156. Plaintiff WALKER noticed Defendant BAYER following him as he walked around Ann Arbor. Mr. Walker confronted Defendant Bayer about repeatedly following him. Mr. Bayer pretended to be deaf, gesturing theatrically and refusing to communicate.

157. Defendant BAYER pretended to be disabled and harassed Plaintiff WALKER, yelling at Mr. Walker in public for several minutes on multiple occasions in acts that were both humiliating and inflammatory.

158. These bizarre and demeaning performances were deliberate efforts to humiliate Plaintiff WALKER, mock his reasonable safety concerns, and mask Defendants stalking behaviors behind a contrived disability ruse. Defendant VICTORIAN also utilized similar tactics on another occasion.

159. Defendant BAYER’s conduct was calculated psychological harassment intentionally used to obscure the nature of the surveillance operation targeting Plaintiff WALKER.

160. In another instance, Plaintiff WALKER again noticed Defendant BAYER following him as he walked around Ann Arbor.

161. Plaintiff WALKER became aware that Defendant BAYER was following him in a white Jeep Compass that was known to Plaintiff Walker as a City

Shield vehicle. When Mr. Walker attempted to ask Mr. Bayer why he was following him, Mr. Bayer escalated the encounter by loudly yelling on a public street that Mr. Walker was "trying to rob him" and "steal his wallet."

162. Defendant BAYER's outburst was designed to attract attention to Plaintiff WALKER, a young Black man, and to frame him as a criminal threat for merely asking a question in public in an attempt to understand why he was being followed by Mr. Bayer.

163. Defendant BAYER's conduct was purposefully humiliating, dangerous, racially charged, wholly unjustified, and it intentionally weaponized racial stereotypes to intimidate and harass Plaintiff WALKER.

164. This use of theatrical deception to humiliate and frustrate Plaintiff WALKER was not an isolated incident.

165. Multiple agents employed by Defendant CITY SHIELD engaged in similar ruses on separate occasions, strongly suggesting that this was a deliberate and approved tactic—not rogue behavior, but a coordinated method of harassment and intimidation.

166. The pattern reflects a systemic strategy by Defendants CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN, and other CITY SHIELD employees and agents to disorient, mock, and psychologically harass, intimidate, and inflict emotional distress upon Plaintiff WALKER.

167. Defendants CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN, and other CITY SHIELD employees and agents continued, coordinated, and escalated the harassment campaign through intimidating and manipulative conduct designed to provoke fear in Plaintiff WALKER.

168. For instance, on one occasion, a vehicle previously identified by Plaintiff WALKER as being utilized by Defendant CITY SHIELD accelerated toward him in a University parking lot of the University's central administrative building, only to swerve away at the last moment.

169. The act was clearly intended to simulate a vehicular assault and terrorize Mr. WALKER.

**UMPD Officers Attack, Detain, and Arrest Plaintiff WALKER as He Watched from Afar as Others Participated in a Demonstration**

170. Organizations ranging from fraternities to cultural organizations to non-university affiliated groups regularly utilize campus spaces—especially a central public space like the Diag—to demonstrate and freely share their opinions.

171. The Diag is clearly a traditional public forum.

172. The University scheduled an annual event called Festifall for August 28, 2024. The event brings together student organizations to host tables in and around the Diag and is well attended by undergraduate students and others.

173. On August 28, 2024, students, faculty, staff, and community members participated in a die-in on the Diag.

174. Participants in the die-in silently laid on the ground as the names of Palestinians under the age of 1 years old who have been killed were read aloud. Demonstrators did not take any actions to intimidate or threaten participants of Festifall and no students were obstructed from attending the event or accessing tables at the event.

175. Plaintiff WALKER was present near the Diag observing the demonstration. Mr. Walker was not on the Diag. He engaged in no protest activity at that time. He stood outside the brick space that the University publicly defines as the Diag.

176. Roughly one hour into the Festifall Protest, UMPD officers ordered participants to disperse.

177. Plaintiff WALKER did not participate in the die-in demonstration nor did he enter the area that was eventually subjected to a dispersal order.

178. Plaintiff WALKER was peacefully recording the surrounding scene at Festifall when he was suddenly and without warning ambushed and violently slammed to the ground by Defendant CAVANAUGH.

179. Without issuing any verbal commands, warning, or opportunity to comply, Defendant CAVANAUGH rushed Plaintiff WALKER from behind and tackled him to the ground using the full weight of his body.

180. No officer ordered Plaintiff WALKER to leave the place where he stood. No officer told him that he was violating a trespass warning. No officer gave him a chance to walk away before Defendant CAVANAUGH tackled him.

181. Defendant CAVANAUGH was quickly joined by Defendant WEST and other UMPD officers who used the weight of their bodies to further pin, restrain, and arrest Plaintiff WALKER suddenly and violently.

182. Defendant CAVANAUGH was the arresting officer. He and other officers grabbed Plaintiff WALKER's left shoulder and moved it up and down while telling him to stop resisting.

183. Plaintiff WALKER was not engaging in any unlawful acts.

184. Plaintiff WALKER did not resist arrest.

185. Defendant CAVANAUGH and Defendant UMPD Officers' arrest of Plaintiff WALKER was unnecessary, unprovoked and executed with unnecessary and excessive force.

186. UMPD officers physically attacked, forcibly detained, and arrested Plaintiff WALKER in front of the University's largest organizational fair where thousands of participants were in attendance, which was an act clearly intended to intimidate and publicly humiliate him.

187. While detained, Plaintiff WALKER asserted his right not to sign paperwork without the presence of legal counsel. UMPD officers then placed Mr.

WALKER in handcuffs, removed his boots, and transported him to a police vehicle, stating that he was being taken to jail. UMPD officers also seized Plaintiff WALKER's mobile phone and his University identification card. They had no warrant or basis to do so.

188. Plaintiff WALKER had to buy a replacement phone on September 18, 2024, at a cost of over a thousand dollars.

189. Plaintiff WALKER was then booked at the Washtenaw County Jail, where UMPD formally requested that he be charged with felony resisting and obstructing and misdemeanor trespass, charges completely unsupported by the facts.

190. Indeed, Plaintiff WALKER's own recording captured where he stood and what he was doing, and so did the body-worn cameras of UMPD officers. Defendants CAVANAUGH and WEST had access to that evidence before UMPD requested charges.

191. Plaintiff WALKER requested to speak to counsel while detained and was denied access to counsel.

192. Three participants of the Festifall protest were detained by UMPD, but they were detained only for a brief period of time. They were released within about three hours.

193. Plaintiff WALKER spent the night in custody before being released the following day without charge.

194. Thousands of students and others were on and around the Diag for the Festifall that afternoon. Defendants did not tackle or arrest them for being there.

195. In a public statement dated August 30, 2024, the University said that counter-protestors at the scene "were also warned that they were violating policies and were asked to leave, which they did." Plaintiff WALKER received no such warning and no such chance to leave.

196. The same statement said that four people were arrested "after they again refused to disperse." Upon information and belief, Plaintiff WALKER was one of the four. He was not part of the demonstration, and no officer ordered him to disperse.

197. Documents and video recordings produced in Plaintiff WALKER's criminal proceedings show that, prior to Defendant CAVANAUGH'S unwarranted assault on Plaintiff, Officer Cavanaugh had a conversation with other officers planning and strategizing how they could search for, identify, and detain Plaintiff WALKER, regardless of his conduct.

198. Indeed, Defendant ROBERTS stated that UMPD officers had already decided to "take [Walker] down" before Festifall had even begun, explicitly declaring that they intended to do so as soon as they saw him.

199. Defendants CAVANAUGH, ROBERTS, and other UMPD Officers established a predetermined plan to arrest Plaintiff WALKER on sight, regardless of his conduct.

**Defendants Terminated Plaintiff's Employment and Forever Barred Plaintiff Walker from Future Employment**

200. From May-August 2024, Plaintiff WALKER was working a summer job as a Technical Program Specialist with the Inter-University Consortium for Political and Social Research at the Institute for Social Research at the University of Michigan.

201. In August 2024, Plaintiff WALKER's summer supervisor in the Institute for Social Research offered him a Program Specialist position for the fall semester, which Plaintiff WALKER was excited to accept. The supervisor then took additional steps to facilitate Plaintiff WALKER's transition to a fall position with the Institute for Social Research.

202. Plaintiff WALKER planned to continue employment throughout his time at the University of Michigan in order to afford the costs of attending the University and living in Washtenaw County.

203. On September 1, 2024, Plaintiff WALKER lost access to his University Dropbox account that he utilized for his previous on-campus employment and that the University utilized to send secure documents to University affiliates.

204. On September 9, 2024, Defendant GRIER terminated Plaintiff WALKER's employment relationship with the University and permanently banned him from rehire at the University of Michigan.

205. Defendant GRIER informed Plaintiff WALKER that the adverse employment actions to terminate his employment relationship with the University and blacklist him were initiated by UMPD notifying University Human Resources about two trespass bans that were issued to Plaintiff WALKER.

206. Based on that information from UMPD, Defendant GRIER stated that Plaintiff WALKER was ineligible for rehire at the University because he allegedly violated his May 23, 2024 trespass ban, which banned him from the Diag, and because he was issued another trespass ban on August 28, 2024, which banned him from the full campus.

207. Defendant GRIER did not provide Plaintiff WALKER with any documents or information sharing or explaining why she received information from UMPD about Mr. Walker; how she reviewed the information from UMPD; how she authenticated the information from UMPD; and how she reached a decision to take adverse employment action against Mr. Walker once she received the information from UMPD.

208. Defendant GRIER did not provide Plaintiff WALKER with any information as to what was the basis of either the trespass bans or these adverse employment actions.

209. Plaintiff WALKER emailed Defendant GRIER several times to request additional information in writing regarding the adverse employment actions taken against him.

210. Defendant GRIER refused to provide Plaintiff WALKER with the requested information.

211. No University of Michigan policy or rule states that an individual who is issued or found to be in violation of a trespass ban would be terminated, blacklisted from University employment, or face any other adverse employment actions.

212. No other individuals have ever been known to receive adverse employment actions solely based on a trespass ban.

**Defendants Continue to Retaliate Against Plaintiff WALKER for his Advocacy in Support of Palestinian Human Rights with Ongoing Surveillance, Excessive and Invasive Searches, and Baseless Criminal Charges**

213. Following the Festifall protest, Defendants REGENTS, ONO, HEWLETT, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, and YENCER and other UMPD Officers directed Defendant CITY SHIELD to continue subjecting Plaintiff WALKER to an

extensive, coordinated, and unlawful campaign of surveillance, stalking, and harassment.

214. This joint operation is believed to be coordinated and participated in by all Defendants and to function as a shadow surveillance network to suppress speech and viewpoints of which the University disapproved.

215. For months, University Defendants, including but not limited to Defendants REGENTS, ONO, HEWLETT, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, other UMPD Officers and YENCER continued to collaborate and coordinate with Defendants CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN, and other CITY SHIELD employees and agents to harass, embarrass, attack, intimidate, surveil, stalk, follow, and track Plaintiff WALKER.

216. Upon information and belief, these actions were not part of any criminal investigation.

217. UMPD Officers referred to Plaintiff WALKER's political advocacy for Palestine in official police records, despite such information having no legitimate law-enforcement relevance.

218. Defendants FELTES and GREELEY explicitly recorded Plaintiff WALKER's affiliation with the University on official UMPD paperwork as "Pro Palestinian."

219. Additionally, UMPD officers at Festifall stated that pro-Palestinian anti-genocide students were being subjected to strict and disparate enforcement by UMPD.

220. The events and alleged conduct leading to Plaintiff's two misdemeanor trespass charges occurred wholly within the Washtenaw County. Typically, local prosecutors handle all criminal charges that occur solely within their county.

221. However, Defendant REGENTS sought criminal charges from the Attorney General against Plaintiff WALKER related to his peaceful advocacy during the May 21, 2024 Encampment raid and his observation and recording of the Festifall protest on August 28, 2024.

222. Even though Plaintiff WALKER was a student attending on-campus protests, the Attorney General chose to prosecute Mr. Walker for one alleged misdemeanor trespass charge for each protest event.

223. After all criminal charges had been filed against Plaintiff WALKER, Defendants REGENTS, ONO, WASHINGTON, JAMES, CAVANAUGH, and YENCER, working in concert with other UMPD officers and Defendants CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN, and other CITY SHIELD employees and agents, sought and obtained multiple search warrants targeting Mr. WALKER's private digital communications, data stored on the device, and cloud based data.

224. These warrants authorized the search of Plaintiff WALKER's cell phone, as well as his Google account, which contained sensitive personal, academic, religious, political materials, and privileged attorney-client communications in the midst of ongoing criminal misdemeanor proceedings.

225. All of these searches were pursued in connection with, and purportedly justified by, alleged misdemeanor trespass, a minor offense that, even if it had been true, in no way warranted the extreme intrusion into Plaintiff WALKER's devices and digital assets.

226. To manufacture probable cause for these highly invasive searches, Defendants surveilled and tracked Plaintiff WALKER, and then, manipulated and exaggerated UMPD police reports, including at least two known reports authored by agents of Defendant CITY SHIELD.

227. These reports were prepared with what appears to be the assistance and involvement of UMPD officers, who actively encouraged the filing of complaints that could serve as a pretext for investigative subpoenas and warrant affidavits.

228. In one report, Defendant KINCANNON claimed that Plaintiff WALKER had "assaulted" him.

229. The alleged "assault" consisted of Plaintiff WALKER using a cellphone camera with a flash to record Defendant KINCANNON as he surveilled, tracked, and followed Mr. Walker from location to location in Ann Arbor at night.

230. There was no physical contact, threat, or unlawful act – and there was no assault.

231. Defendant KINCANNON told UMPD that he took multiple pictures of Plaintiff WALKER during the encounter. He also told UMPD that City Shield employees “were provided a picture of Walker because he had been causing issues on the Diag and other areas.”

232. Defendant KINCANNON was present and knew that Plaintiff WALKER never touched or threatened him. He knew that the light came from the phone that Plaintiff WALKER was using to record him. He nonetheless asked UMPD to send his report to the prosecutor.

233. On April 17, 2025, the Washtenaw County Prosecutor declined to authorize any charge based on that report. The stated reason was “[l]ack of crime elements.” The Prosecutor found that “Mr. Walker was videotaping at night and the light from the camera was shined in” the City Shield employee’s eye.

234. The warrant affidavits included false statements. The affiants knew that the statements were false or recklessly disregarded their falsity. They took no steps to corroborate them. With the false statements removed – and the omitted facts included – the affidavits did not establish probable cause to search Plaintiff WALKER’s cell phone or Google account. But for these false statements and omissions, the warrants would not have issued.

235. Similarly, Defendant CRAIG filed a report accusing Plaintiff WALKER of "acting suspiciously" and nothing more. The report did not describe any specific actions or alleged crimes.

236. Defendants KINCANNON and CRAIG made these reports knowing and intending that UMPD would use them to seek criminal charges and search warrants against Plaintiff WALKER. They are responsible for the searches that followed.

237. In May 2025, the Michigan Attorney General's Office abruptly dismissed ***all*** criminal charges against Plaintiff WALKER.

**Months of Surveillance, Stalking, and Targeted Repression Have Profound Impact on Plaintiff WALKER's Well-Being**

238. Defendants conspired, collaborated, and coordinated amongst themselves to continue a months-long campaign of surveillance, harassment, and retaliation on Plaintiff WALKER.

239. Defendants conspired, collaborated, and coordinated amongst themselves to inflict emotional distress on Plaintiff WALKER.

240. During the pendency of Defendants' campaign of surveillance and retaliation, Mr. WALKER's educational, professional, and personal life was placed on indefinite hold.

241. Plaintiff WALKER was subjected to unrelenting surveillance, public vilification, and direct threats to his liberty; all because of the content of his speech

and viewpoints, his identity as a Black Muslim, his association with others holding similar views, and his refusal to remain silent about mass atrocities and systemic injustice.

242. The loss of his employment and his inability to seek employment with any office, department, or program at the University and had a serious financial impact on Plaintiff WALKER, which impacted his ability to afford the costs of his education at the University and the costs of living in Washtenaw County.

243. This pattern of unrelenting surveillance and intimidation, carried out by private operatives under university contract, ultimately forced Plaintiff WALKER to take multiple leaves of absence from his undergraduate degree due to emotional and psychological distress.

244. Plaintiff WALKER was also so impacted by the violation of his rights that he refrained from participating in demonstrations, campaigns, marches, educational events, cultural events, and other expressive activities he would normally attend because he feared further targeting and retaliation.

245. Defendants' coordinated campaign continues have a chilling effect on Plaintiff WALKER's rights to organize, pray, study, and exist on campus as a visible Black Muslim and pro-Palestinian advocate.

## V. COUNT 1: 42 U.S.C. §1983 – U.S. Const., Amend. I & XIV Free Speech, Assembly, and Petition

246. Plaintiff WALKER repeats and re-alleges the allegations contained in Paragraphs 1-246, as though fully stated herein.

247. Plaintiff WALKER brings this claim pursuant to 42 U.S.C. §1983.

248. Acting under color of law and pursuant to the customs, policies and/or practices of the University of Michigan, Defendants acting in their respective individual and/or official capacities engaged in conduct and adopted policies that violate Plaintiff WALKER's free speech, freedom of association, and petition rights under the First and Fourteenth Amendments of the U.S. Constitution.

249. The First Amendment reads: "Congress shall make no law … abridging the freedom of speech … or the right of people to peacefully assemble, and to petition the Government for a redress of grievances."

250. The First Amendment is incorporated within the Fourteenth Amendment and thereby made applicable to state governments and their subdivisions.

251. Under the First Amendment, state actors cannot discriminate or retaliate against persons because of the content of their speech; the views expressed; for associating with others expressing similar views; and for petitioning state governments and subdivisions.

252. The Defendants' actions discriminated against the Plaintiff because of the views that he expressed and the content of his speech; because of his association

with others expressing similar views; and for petitioning the University of Michigan to change its investment policies.

253. The Defendants actions were calculated to deter, punish, and delegitimize Plaintiff WALKER because he challenged the University's preferred speech, viewpoints, and affiliations.

254. Unlike similarly situated students and demonstrators engaged in similar activity, Plaintiff WALKER was subjected to uniquely discriminatory and retaliatory treatment that was both severe and punitive, solely because of his viewpoints; the content of speech; his association with groups and persons holding similar views; and his attempts to petition the University to change its policies.

255. Similarly situated students who engaged in other protest movements, have been able to engage in substantially similar protest activities without arrest, banishment, or surveillance, while Plaintiff WALKER was repeatedly criminalized, attacked, surveilled, and excluded from campus.

256. The disparity in treatment reveals the true motive behind Defendants' conduct: to suppress dissenting speech related to Palestinian rights and to penalize Plaintiff WALKER for being a Black, Muslim, pro-Palestine student leader.

257. Defendant UMPD officers repeatedly documented Plaintiff WALKER's pro-Palestinian views in internal reports, treating his political identity as a basis for heightened scrutiny and law enforcement intervention.

258. Whereas students engaging in group rallies on campus and advocating for other social or political causes have done so without any harassments, punishments, or adverse actions by the Defendants, Plaintiff WALKER was repeatedly discriminated against and subjected to unlawful retaliation through a series of harassments and punishments that would deter a reasonable person for engaging in such speech, expressing their viewpoints; associating with others holding similar views; and petitioning the University.

259. At all relevant times, Plaintiff WALKER engaged in peaceful, nonviolent advocacy concerning the humanitarian crisis in Gaza, calls for institutional divestment, and other matters of public concern. His speech, viewpoints, association with others holding similar views, and his petitioning of the University were protected under the First Amendment.

260. But for his viewpoints and the content of his speech, including but not limited to his support of human rights for Palestinians, for divestment from Israel, for an end to a genocide undertaken by the Israeli government against Palestinians in Gaza, and other speech that viewed by the Defendants as pro-Palestinian, Defendants would not have punished, discriminated and retaliated against Plaintiff WALKER.

261. But for his association with others expressing similar viewpoints and engaging in speech that the Defendants viewed as pro-Palestinian, Defendants would not have punished, discriminated and retaliated against Plaintiff WALKER.

262. But for petitioning for a change to University policies that the Defendants viewed as pro-Palestinian, Defendants would not have discriminated and retaliated against Plaintiff WALKER and would not have punished, discriminated and retaliated against him.

263. Defendants REGENTS, GRASSO, ONO, HEWLETT, GRIER, EXECUTIVE DIRECTOR DPSS, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, and YENCER acts of discrimination, retaliation, harassment, and punishment against Plaintiff WALKER because of the content of his speech and his viewpoints; for his association with others holding similar viewpoints; and for his petitioning University administrators on the issues, include but are not limited to:

- Surveilling, stalking, harassing, threatening, demeaning, and invading the privacy of Plaintiff WALKER;
- Hiring, coordinating, and collaborating with Defendant CITY SHIELD to surveil, stalk, harass, threaten, demean, and invading the privacy of Plaintiff WALKER;
- Detaining Plaintiff WALKER without reasonable suspicion of him having committed a crime;
- Arresting Plaintiff WALKER without probable cause;

- Assaulting Plaintiff WALKER during protest and expressive activities and taking actions including spraying him with chemical agents, tackling him, striking him, and taking other physical actions against his person;
- Seizing Plaintiff WALKER's personal property and religious items without due process or probable cause;
- Fabricating false police narratives against Plaintiff WALKER;
- Maliciously prosecuting Plaintiff WALKER without probable cause;
- Issuing a trespass ban excluding Plaintiff WALKER from the entire campus;
- Terminating Plaintiff WALKER's employment with the University;
- Forever barring Plaintiff WALKER from future employment at the University of Michigan; and
- Other adverse conduct as stated in the statement of facts of this pleading.

264. Defendants CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN acts of discrimination, retaliation, harassment, and punishment against Plaintiff WALKER because of the content of his speech and his viewpoints; for his association with others holding similar viewpoints; and for his petitioning University administrators on the issues, include but are not limited to:

- Surveilling, stalking, harassing, threatening, demeaning, invading the privacy of Plaintiff WALKER;

- Fabricating false police narratives against Plaintiff WALKER; and

- Other adverse conduct as stated in the statement of facts of this pleading.

265. Defendants' acts of prior restraint against Plaintiff WALKER, include but are not limited to:

- Banning Plaintiff WALKER from the Diag and the entire campus;

- Barring Plaintiff WALKER from future employment at the University of Michigan; and

- Other adverse conduct as stated in the statement of facts of this pleading.

266. These actions were not neutral enforcement decisions but calculated efforts to discriminate, retaliate, harass, punish, and delegitimize Plaintiff WALKER to deter him from engaging in constitutionally protected speech and political organizing; associating with others holding similar viewpoints; and petitioning University administrators on issues that the Defendants viewed as pro-Palestinian.

267. Plaintiff WALKER's speech, political organizing, associations, and petitions challenged the Defendants preferred viewpoints on these issues and challenged the University's political and financial affiliations.

268. As a direct and proximate result of the enactment and enforcement of Defendants' policies and practices, Plaintiff WALKER suffered and will continue to suffer a loss of his constitutionally protected rights.

269. Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to Plaintiff WALKER.

270. As a result of the foregoing acts and omissions, Plaintiff WALKER is entitled to declaratory relief and appropriate injunctive relief against all Defendants together with costs, and attorney fees.

271. As a result of the foregoing acts and omissions, Plaintiff WALKER is entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages together with costs, and attorney fees against Defendants ONO, GRIER, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, and YENCER, individually, and against CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN.

272. Plaintiff WALKER further seeks nominal damages for any established violation of his constitutional rights under this Count, even if Plaintiff cannot establish actual compensable injury resulting from that violation, against each Defendant from whom such monetary relief is legally available.

## VI. COUNT 2: 42 U.S.C. §1983 – U.S. Const., Amend. XIV Substantive and Procedural Due Process (Deprivation of Liberty & Property Interests)

273. Plaintiff WALKER repeats and re-alleges the allegations contained in Paragraphs 1-246, as though fully stated herein.

274. Plaintiff WALKER brings this claim pursuant to 42 U.S.C. § 1983.

275. Acting under color of law, Defendants, in their individual and/or official capacities, engaged in conduct and adopted policies that violate Plaintiff WALKER's due process rights under Amend. XIV of the U.S. Constitution.

276. The Due Process clause of Amendment XIV states, in pertinent part: "No state … shall any state deprive any person of … liberty, or property without due process of law."

277. Under the Due Process clause, persons possess a liberty and/or property interest in their person and their property.

278. Plaintiff WALKER has a liberty and/or property interest in his ability to move freely in his community, to his education, to work opportunities, and in the integrity of his person and property.

**A. Substantive Due Process**

279. Defendants REGENTS, ONO, WASHINGTON, JAMES, CAVANAUGH, HARDING, ROBERTS, WEST, and YENCER actions that

deprived Plaintiff WALKER of his liberty and/or property interests without due process of law, include but is not limited to:

- Subjecting Plaintiff WALKER to unlawful detention;
- Subjecting Plaintiff WALKER to unlawful arrest;
- Unlawfully seizing Plaintiff WALKER's mobile phone and other personal property;
- Unlawfully searching Plaintiff WALKER's mobile phone and other personal property; and
- Unlawfully searching Plaintiff WALKER's personal digital accounts.

280. These actions were arbitrary and were taken to punish Plaintiff WALKER for his protected speech.

**B. Procedural Due Process**

281. Defendants REGENTS, GRASSO, ONO, GRIER, EXECUTIVE DIRECTOR DPSS, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, and YENCER also deprived Plaintiff WALKER of his liberty and/or property interests without notice or a fair opportunity to be heard. Their actions include but are not limited to:

- Banning Plaintiff WALKER from campus;
- Restraining Plaintiff WALKER's ability to move through the Ann Arbor community, including the University of Michigan's campus;

- Terminating Plaintiff WALKER's employment;
- Barring Plaintiff WALKER from future employment with the University;
- Taking and holding Plaintiff WALKER's mobile phone, religious items, and other personal property without notice or any opportunity to be heard; and
- Other conduct as stated in the statement of facts of this pleading.

282. These actions were arbitrary and were taken to punish Plaintiff WALKER for his protected speech.

283. Defendants CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN actions that deprived Plaintiff WALKER of his liberty and/or property interests without due process of law, includes but is not limited to:

Restraining his ability to move through the Ann Arbor community, including the University of Michigan's campus.

284. The Due Process clause requires that before taking or diminishing one's liberty or property interests (or in some cases very soon thereafter), state actors must provide persons notice; a full and fair opportunity to be heard; the opportunity to present and rebut evidence; and a fair and impartial decision maker.

285. Defendants' policies and practices, as stated above, violate the Due Process clause by denying Plaintiff WALKER fair notice of the adverse actions brought against him; denying Mr. WALKER a fair opportunity to be heard; by denying a fair opportunity to rebut evidence introduced against him; by failing to

provide a fair and impartial decision maker; and by failing to follow their own prescribed procedures.

286. The taking and holding of Plaintiff WALKER's property were not random or unauthorized acts. The May 21, 2024 seizure was part of a planned and supervised operation that DPSS leadership authorized. The August 28, 2024 seizure followed a predetermined plan to arrest Plaintiff WALKER on sight.

287. UMPD's own reports state that seized items were sorted and placed in containers to be logged. Yet Defendants never gave Plaintiff WALKER notice of the seizure or a hearing.

288. In the alternative, Michigan's post-deprivation remedies are inadequate. A later claim for money cannot restore to a person the use of religious articles, such as a Quran or a prayer mat, during the time he is deprived of them.

289. As a direct and proximate result of the enactment and enforcement of Defendants' policies and practices, Plaintiff WALKER suffered and will continue to suffer a loss of his constitutionally protected rights.

290. Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to Plaintiff WALKER.

291. As a result of the foregoing acts and omissions, Plaintiff WALKER is entitled to declaratory relief and appropriate injunctive relief against all Defendants together with costs, and attorney fees.

292. As a result of the foregoing acts and omissions, Plaintiff WALKER is entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages together with costs, and attorney fees against Defendants ONO, GRIER, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, and YENCER individually and against CITY SHIELD KINCANNON, CRAIG, BAYER, and VICTORIAN.

293. Plaintiff WALKER further seeks nominal damages for any established violation of his constitutional rights under this Count, even if Plaintiff cannot establish actual compensable injury resulting from that violation, against each Defendant from whom such monetary relief is legally available.

## VII. COUNT 3: 42 U.S.C. §1983 – U.S. Const., Amend. IV & XIV Unlawful Search & Seizure (Excessive Force, False Arrest, Unlawful Search and Seizure, and Judicial Deception)

294. Plaintiff WALKER repeats and re-alleges the allegations contained in Paragraphs 1-246, as though fully stated herein.

295. Plaintiff WALKER bring this claim pursuant to 42 U.S.C. §1983.

296. Acting under color of law and pursuant to the customs, policies and/or practices of the University of Michigan, Defendants, acting in their respective individual and/or official capacities engaged in conduct and adopted policies that

violate Plaintiff WALKER right to be free from unlawful searches and seizures under the Fourth and Fourteenth Amendments of the U.S. Constitution.

297. The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures, including seizures of their person and property without probable cause.

298. The Fourth Amendment requires searches and seizures to be narrowly tailored to specific evidence of a crime.

299. The right to be free from unreasonable searches and seizures includes, but is not limited to, a right to be free from arrest and detention without probable cause; to be free from searches and seizures of one's property without a proper warrant; to be free from excessive force during seizures of one's person; and to be free from judicial deception in the drafting of arrest and search warrants.

300. Plaintiff WALKER possessed a reasonable expectation of privacy in the contents of his cell phone, Google accounts, and related digital assets and communications. Such data includes private messages, contact information, personal photographs, religious materials, academic documents, location information, and privileged attorney-client communications.

301. Defendants WASHINGTON, JAMES, CAVANAUGH, HARDING, ROBERTS, WEST, YENCER, and JOHN DOE OFFICERS 1 and 2's actions in

violation of Plaintiff WALKER's right to be free from excessive force, false arrest, unlawful searches and seizures, and judicial deception, includes but is not limited to:

- Detaining Plaintiff WALKER without reasonable suspicion that he had committed a crime;

- Spraying Plaintiff WALKER with a high-dose of chemical agents and throwing him to the ground, despite the fact that he was complying with officers' orders;

- Gang tackling and used excessive force against Plaintiff WALKER to detain him without reasonable suspicion that he had committed a crime and to arrest him without probable cause for an arrest;

- Arresting and holding Plaintiff WALKER overnight without probable cause;

- Individually and/or jointly collaborating with Defendant CITY SHIELD to produce embellished, inaccurate, knowingly false, and fabricated "reports" portraying Plaintiff WALKER as a threat to create a pretext to target him for detention, arrest, and to obtain a search warrant through judicial deception to search of his personal property and private electronic data;

- Seized Plaintiff WALKER's personal property, including but not limited to his mobile phone and religious items, without a warrant and despite the absence of probable cause;

- Searched Plaintiff WALKER's private accounts, emails, location history, search history, and cloud-stored content, despite the absence of probable cause;

- The execution of the search warrants constituted a digital dragnet—far broader than necessary, lacking particularity, and designed to collect information unrelated to any alleged offense and were not narrowly tailored to specific evidence of a crime;

- Other conduct as stated in the statement of facts of this pleading.

302. Defendants CITY SHIELD, KINCANNON, and CRAIG violated Plaintiff WALKER's right to be free from unlawful searches and judicial deception. They made false and misleading reports to UMPD, including the false report of an "assault." They knew and intended that the reports would be used to obtain warrants to search Plaintiff WALKER's cell phone and Google account.

303. As a direct and proximate result of the enactment and enforcement of Defendants' policies and practices, Plaintiff WALKER suffered and will continue to suffer a loss of his constitutionally protected rights to be free from unlawful governmental searches and seizures.

304. Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to Plaintiff WALKER.

305. As a result of the foregoing acts and omissions, Plaintiff WALKER is entitled to declaratory relief and appropriate injunctive relief against Defendants REGENTS, GRASSO, ONO, HEWLETT, EXECUTIVE DIRECTOR OF DPSS, WASHINGTON, JAMES, CAVANAUGH, HARDING, ROBERTS, WEST, and YENCER in their official capacities and against CITY SHIELD, KINCANNON, and CRAIG together with costs, and attorney fees.

306. As a result of the foregoing acts and omissions, Plaintiff WALKER is entitled to compensatory damages, including but not limited to out-of-pocket costs

and expenses, mental anguish, and emotional distress, punitive damages together with costs, and attorney fees against Defendants ONO, WASHINGTON, JAMES, CAVANAUGH, HARDING, ROBERTS, WEST, YENCER and JOHN DOE OFFICERS 1 and 2 individually and against CITY SHIELD, KINCANNON and CRAIG.

307. Plaintiff WALKER further seeks nominal damages for any established violation of his constitutional rights under this Count, even if Plaintiff cannot establish actual compensable injury resulting from that violation, against each Defendant from whom such monetary relief is legally available.

## VIII. COUNT 4: 42 U.S.C. §1983 – U.S. Const., Amend. XIV Equal Protection Rights (Discrimination on the Basis of Race and Religion)

308. Plaintiff WALKER repeats and re-alleges the allegations contained in Paragraphs 1-246, as though fully stated herein.

309. Plaintiff WALKER bring this claim pursuant to 42 U.S.C. §1983.

310. Acting under color of law and pursuant to the customs, policies and/or practices of the University of Michigan, Defendants, acting in their respective individual and/or official capacities engaged in conduct and adopted policies that violate Plaintiff WALKER's equal protection rights under Amend. XIV of the U.S. Constitution.

311. The Equal Protection Clause of Amendment XIV states, in pertinent part: "No state shall … deny to any person within its jurisdiction the equal protection of the laws."

312. The Equal Protection Clause requires state actors to treat similarly situated persons equally.

313. Defendants' conduct, as described above, violated the Equal Protection Clause by discriminating against Plaintiff WALKER on the basis of his race and religion.

314. Defendants knew that Plaintiff WALKER is Black and Muslim. UMPD's reports record his race. Defendant CAVANAUGH issued the trespass ban while Plaintiff WALKER was recovering Qurans and prayer mats from UMPD. Agents of Defendant CITY SHIELD watched and photographed him at Friday prayers and reported on him to UMPD.

315. But for Plaintiff WALKER's identity as a Black Muslim student advocating in support of Palestinian human rights, Plaintiff WALKER would not have been subjected to adverse actions from Defendants including, but not limited to:

- Surveil, stalk, harass, threaten, demean, and invade the privacy of Plaintiff WALKER;
- Fabricated and falsified police narratives for use against Plaintiff WALKER;

- Using fabricated information to justify trespass orders and engage in unlawful detentions, arrests, searches and seizures; and
- Other adverse conduct as stated in the statement of facts of this pleading.

316. As a direct and proximate result of the enactment and enforcement of Defendants' policies and practices, Plaintiff WALKER suffered and will continue to suffer a loss of his constitutionally protected rights to equal protection of the law.

317. Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to Plaintiff WALKER.

318. As a result of the foregoing acts and omissions, Plaintiff WALKER is entitled to declaratory relief and appropriate injunctive relief against Defendants REGENTS, GRASSO, ONO, HEWLETT, EXECUTIVE DIRECTOR OF DPSS, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, and YENCER in their official capacities and against CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN, together with costs, and attorney fees.

319. As a result of the foregoing acts and omissions, Plaintiff WALKER is entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages together with costs, and attorney fees against Defendants ONO, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, and

YENCER, individually, and against CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN.

320. Plaintiff WALKER further seeks nominal damages for any established violation of his constitutional rights under this Count, even if Plaintiff cannot establish actual compensable injury resulting from that violation, against each Defendant from whom such monetary relief is legally available.

## IX. COUNT 5: 42 U.S.C. §1985
## Conspiracy to Deprive Persons of Equal Protection of Laws

321. Plaintiff WALKER repeats and re-alleges the allegations contained in Paragraphs 1-246, as though fully stated herein.

322. Plaintiff WALKER brings this claim pursuant to 42 U.S.C. § 1985(3).

323. Section 1985(3) prohibits two or more persons from conspiring to violate a person's constitutional rights.

324. The actions of the Defendants were taken under color of state law.

325. The University of Michigan Defendants REGENTS, GRASSO, ONO, HEWLETT, EXECUTIVE DIRECTOR OF DPSS, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, and YENCER and the City Shield Defendants CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN or a subset of Defendants within the two groups conspired to deny Plaintiff WALKER of the equal protection of the law permitting

him to engage in constitutionally protected speech, association, and petition activities and to be free from unreasonable searches and seizures.

326. As noted above, similarly situated persons engaged in similar activity but expressing differing viewpoints, such as pro-Israeli viewpoints, were not subject to the discrimination, retaliation, harassment, and punishments experienced by the Plaintiff WALKER.

327. But for his immutable identities as a Black Muslim who held pro-Palestinian viewpoints, his association with pro-Palestinian persons, and his petitioning in support of Palestinians, the Defendants REGENTS, GRASSO, ONO, HEWLETT, EXECUTIVE DIRECTOR OF DPSS, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, and YENCER and the Defendants CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN would not have conspired to discriminate, retaliate, harass, and punish the Plaintiff WALKER.

328. The actions of the Defendants REGENTS, GRASSO, ONO, HEWLETT, EXECUTIVE DIRECTOR OF DPSS, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, YENCER, CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN were motivated by discriminatory animus against the Plaintiff WALKER because

of his race and religion, as well as, his pro-Palestinian viewpoints, association with pro-Palestinian persons, and petitioning in support of Palestinians.

329. The University of Michigan Defendants REGENTS, GRASSO, ONO, HEWLETT, EXECUTIVE DIRECTOR OF DPSS, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, and YENCER and the City Shield Defendants CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN or a subset of Defendants within the two groups had a single plan to directly cause and institute the deprivation, interference, and restraint of Plaintiff WALKER's constitutional rights.

330. The University of Michigan Defendants REGENTS, GRASSO, ONO, HEWLETT, EXECUTIVE DIRECTOR OF DPSS, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, and YENCER and the City Shield Defendants CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN or a subset of Defendants within the two groups shared a conspiratorial objective to deprive Plaintiff WALKER of his constitutional rights under the First, Fourth, and Fourteenth Amendments.

331. The University of Michigan Defendants REGENTS, GRASSO, ONO, HEWLETT, EXECUTIVE DIRECTOR OF DPSS, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, and YENCER and the City Shield Defendants CITY SHIELD, KINCANNON, CRAIG,

BAYER, and VICTORIAN or a subset of Defendants within the two groups each committed overt acts in furtherance of the conspiracy, including, but not limited to:

- Surveilling, stalking, harassing, threatening, demeaning, invading the privacy of Plaintiff WALKER;
- Fabricating false police narratives against Plaintiff WALKER;
- Using fabricated information to justify trespass orders and engage in unlawful detentions, arrests, searches and seizures; and
- Other adverse conduct as stated in the statement of facts of this pleading.

332. Defendants' acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to Plaintiff WALKER.

333. As a result of the foregoing acts and omissions, Plaintiff WALKER is entitled to declaratory relief and appropriate injunctive relief against Defendants REGENTS, PRESIDENT, ONO, HEWLETT, EXECUTIVE DIRECTOR OF DPSS, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, YENCER, CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN together with costs, and attorney fees.

334. As a result of the foregoing acts and omissions, Plaintiff WALKER is entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, punitive damages together with costs, and attorney fees against Defendants ONO, WASHINGTON, JAMES,

CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, YENCER, CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN.

## X. COUNT 6: MCL 600.2954 – Civil Stalking and Harassment

335. Plaintiff WALKER repeats and re-alleges the allegations contained in Paragraphs 1-246, as though fully stated herein.

336. Under Michigan law, a person who engages in a pattern of conduct that is intended to cause or that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested—and that actually causes the victim to suffer emotional distress—commits stalking. MCL 750.411h, MCL 750.411i. Civil remedies are authorized under MCL 600.2954.

337. Beginning in or around May 2024 and continuing for months, agents of Defendant CITY SHIELD —including but not limited to Defendants KINCANNON, CRAIG, BAYER, and VICTORIAN — engaged in a targeted pattern of surveillance, pursuit, and intimidation directed solely at Plaintiff WALKER.

338. This pattern of conduct included repeatedly following Plaintiff WALKER across campus, photographing and video recording him during non-protest moments, tracking him as he traveled to and from class, monitoring his attendance at prayer services and religious gatherings, and surveilling him at locations wholly unrelated to any security incident.

339. On multiple occasions, agents and employees of Defendant CITY SHIELD stationed themselves outside Plaintiff WALKER's frequented locations and residences, appeared unprompted at events where Plaintiff was present but not organizing, and communicated with UMPD officers to report Mr. Walker's presence in a manner designed to prompt law enforcement intervention.

340. These actions were not the product of a legitimate safety interest or neutral security protocol. Rather, they were undertaken as part of a deliberate and targeted campaign to intimidate, harass, and deter Plaintiff WALKER from continuing his lawful, peaceful activism.

341. The surveillance and intimidation were initiated without legal justification and carried out without Plaintiff WALKER's consent. Defendants knew or should have known that their conduct would cause Plaintiff WALKER to feel frightened, threatened, or harassed.

342. Defendants' actions did, in fact, cause Plaintiff WALKER to experience significant emotional distress, including anxiety, fear for his personal safety, disrupted sleep, and the constant feeling of being watched, followed, and singled out for punishment because of his identity and beliefs.

343. Plaintiff WALKER was also fearful that his friends, classmates, instructional staff, and community members would be targeted by Defendants simply for associating and interacting with him.

344. A reasonable person in Plaintiff WALKER's position would have felt terrorized, threatened, or harassed by the conduct of City Shield agents. Their presence was persistent, unwanted, and conducted in a manner that communicated an implicit threat: that Mr. WALKER was being tracked and targeted for his speech.

345. Defendants' conduct unlawfully interfered with Plaintiff WALKER's liberty, educational experience, and personal security, in violation of Michigan's civil stalking and harassment protections.

346. Defendant CITY SHIELD is vicariously liable for the actions of its agents and employees acting within the scope of their employment and under its supervision.

347. Defendants CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN's conduct was willful, malicious, and carried out with reckless disregard for Plaintiff's rights under both state and federal law.

348. As a direct and proximate result of the enactment and enforcement of Defendants CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN's policies and practices, Plaintiff WALKER suffered and will continue to suffer a loss of his rights.

349. Defendants CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN's acts or omissions, and each of them, were a direct and proximate cause of ongoing injuries and damages to Plaintiff WALKER.

350. As a result of the foregoing acts and omissions, Plaintiff WALKER is entitled to declaratory relief and appropriate injunctive relief against all Defendants together with costs, and attorney fees.

351. As a result of the foregoing acts and omissions, Plaintiff WALKER is entitled to compensatory damages, including but not limited to out-of-pocket costs and expenses, mental anguish, and emotional distress, exemplary damages together with costs, and attorney fees against Defendants CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN.

**JURY DEMAND**

352. Plaintiff WALKER demands a trial by jury in this matter.

**PRAYER FOR RELIEF**

353. WHEREFORE, Plaintiff prays that this Honorable Court enters Judgment against Defendants providing:

a. A declaration that all Defendants, through their coordinated campaign of retaliation, stalking, fabrication, and other such actions violated Plaintiff's right to freedom of speech and expression by retaliating and discriminating against them because of the viewpoints Plaintiff WALKER expressed;

b. An injunction ordering all Defendants to immediately cease all surveillance, tracking, and stalking activities of Plaintiff WALKER;

c. An injunction ordering all Defendants to repeal all trespass bans taken against Plaintiff WALKER and reinstate all prior privileges and statues;

d. An injunction ordering all Defendants to repeal all adverse employment actions taken against Plaintiff WALKER and reinstate all prior privileges and statues;

e. Compensatory damages jointly and severally against the Defendants ONO, GRIER, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, YENCER, JOHN DOE OFFICERS 1 and 2, CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN in whatever amount is fair, just, and equitable for the injuries and damages sustained;

f. Punitive damages against the Defendants ONO, GRIER, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, YENCER, JOHN DOE OFFICERS 1 and 2, CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN in whatever amount is fair, just, and equitable to deter future conduct in violations of students' constitutional rights;

g. Exemplary damages against the Defendants ONO, GRIER, WASHINGTON, JAMES, CAVANAUGH, FELTES, GREELEY, HARDING, ROBERTS, WEST, YENCER, CITY SHIELD, KINCANNON, CRAIG, BAYER, and VICTORIAN in whatever amount is fair, just, and equitable to deter future conduct in violations of students' constitutional rights;

h. Nominal damages for each established violation of Plaintiff WALKER's constitutional rights under 42 U.S.C. § 1983, in an amount permitted by law, against each Defendant subject to monetary liability, regardless of whether Plaintiff establishes actual compensable injury resulting from such violation, in addition to or in the alternative to compensatory damages, as permitted by law;

i. Interest, costs, and attorney fees; and

j. Further relief as is just and equitable.

Respectfully Submitted,

/s/Amy V. Doukoure
Amy V. Doukoure (P80461)
**CAIR-MI LEGAL FUND**
1905 S. Haggerty Road, Suite 5
Canton, MI 48188
(248) 559-2247
adoukoure@cair.com
/s/ Liz Jacob
Liz Jacob (P86981)
John C. Philo (P52721)
**SUGAR LAW CENTER**
**FOR ECONOMIC & SOCIAL JUSTICE**
4605 Cass Ave., 2nd Floor
Detroit, MI 48201
(313) 993-4505/Fax: (313) 887-8470
jphilo@sugarlaw.org
ljacob@sugarlaw.org

/s/Hasan Kaakarli
Hasan Kaakarli (P81099)
Emad R. Hamadeh (P86849)
**AKEEL & VALENTINE, PLC.**
888 W. Big Beaver Rd., Suite 350
Troy, MI 48084
248-996-1286
emad@akeelvalentine.com
hasan@akeelvalentine.com

***Attorneys for Plaintiff***

Dated: October 23, 2026